81 So.2d 576 (1955)
FIDELITY & CASUALTY COMPANY OF NEW YORK, Plaintiff-Appellant,
v.
UNITED STATES FIDELITY & GUARANTY COMPANY et al., Defendant-Appellees.
No. 8345.
Court of Appeal of Louisiana, Second Circuit.
June 20, 1955.
Rehearing Denied July 8, 1955.
Writ of Certiorari Denied October 4, 1955.
Joseph R. Bethard, Dixon & Dixon, Shreveport, for appellant.
Bullock & Bullock, Shreveport, for appellee.
HARDY, Judge.
This is a suit by plaintiff as the subrogated insurer, against risks of loss from fraud, dishonesty, infidelity and forgery, of A. C. Campbell Company and Campbell Construction Company, Inc., for the recovery of losses paid the said assured. The named defendant is the liability insurer of the Continental-American Bank & Trust Company of Shreveport. By supplemental petition the bank was joined as a party defendant. After trial there was judgment rejecting plaintiff's demands, from which this appeal has been brought.
There is no dispute as to the facts involved, which were clearly established on trial. Plaintiff's assured, A. C. Campbell, is, and was at the time of the occurrence of the events hereafter related, engaged in the general contracting business, operating as A. C. Campbell Company and Campbell Construction Company, Inc., with offices in the City of Shreveport. Campbell conducted his banking business through the Continental-American Bank & Trust Company *577 of Shreveport, with which institution he carried large deposits. In the course of business Campbell customarily drew hundreds of checks upon his said bank each month, which withdrawals at times totaled in the neighborhood of a million dollars. All checks bore a facsimile signature of A. C. Campbell, which was affixed by a machine designed for such purpose. Access to the key which operated this check signing machine was open only to Campbell, his son and brother. For a period of some twenty years one C. W. Davis was employed by Campbell as the chief accountant and office manager of his business, and unquestionably Davis was regarded by the personnel of the defendant bank as being a trusted employee, which regard was induced by Campbell's conduct over a period of years by which he indicated his complete confidence and trust in Davis. Davis attended to a substantial portion of Campbell's banking business, particularly in connection with deposits and withdrawals, and in the whole course of the relationship between Campbell and Davis and between these two and the defendant bank there was not evidenced the slightest element of suspicion or doubt which would have served to place the bank on guard in the conduct of its business with Davis as Campbell's representative. Campbell's apparent trust subsisted despite his detection of Davis in one instance of an irregular withdrawal of funds from Campbell's account, which Davis had appropriated to his personal use. This action, however, which occurred several years prior to the incidents giving rise to this suit, was either condoned or overlooked by Campbell in consideration of the circumstances, and, admittedly, no information as to this occurrence was ever disclosed to the bank or, so far as is shown by the record, to anyone else.
In or about July, 1952, Campbell discovered that for a period extending over a considerable number of years prior thereto he had been defrauded by a somewhat simple scheme of embezzlements, forgeries and bank account manipulations concocted and carried out by Davis for his personal gain. Upon this discovery Campbell immediately procured the services of independent auditors for the purpose of making a complete and detailed audit of his affairs back through a period of some years. In preparation for and in the beginning of the conduct of this procedure Davis assisted the auditors in acquainting them with many of the details of the fraudulent transactions. Within a few weeks after the beginning of the auditing operations Davis died.
Pursuant to the results of the audit this plaintiff, the Fidelity & Casualty Company of New York, reimbursed Campbell for his losses to the extent of some $26,000, more or less, in discharge of its obligations under the existing contract of insurance. As subrogee of its insured plaintiff then instituted this suit against the bank and its indemnity insurer. By nonsuit and formal abandonment plaintiff has eliminated by far the greater part of its claims and its demands accordingly were reduced to the total claim of $1,734.60, representing amounts paid out by the bank on 48 separate checks, all of which were presumably presented and cashed at the bank by Davis, who received the proceeds thereof. Eighteen of the checks involved bore the endorsement of C. W. Davis but the remaining thirty checks are free of any endorsement. The checks, varying in amounts and variously dated between January 8, 1946 and July 22, 1948, were all drawn upon and made payable to the Continental-American Bank & Trust Company and all, though prepared and written by Davis, bore Campbell's machine-affixed facsimile signature.
In the customary conduct of the business, according to Campbell's testimony, all checks were prepared and written by Davis and placed on Campbell's desk for signing, usually in lots varying from fifty to several hundred in number. After affixing the signature Campbell turned the checks over to Davis for disposition.
Pleas of prescription of one and five years which were tendered on behalf of defendants and overruled by the district judge have apparently been abandoned and we *578 think properly so, inasmuch as it is evident that this action arises ex contractu and, accordingly, would not be governed by the application of the prescriptive periods which have been urged.
On the merits the defendants first contend that the checks which are the basis of this suit, were bearer instruments and as such payable to the holder thereof, who, it must be assumed, was C. W. Davis; secondarily, defendants urge acquiesence and estoppel.
The opposed positions which are here presented by respective counsel for plaintiff and defendants may be very plainly and briefly stated. Counsel for plaintiff argues that the checks sued on constituted negotiable instruments payable to order, governed by the following provision and definition of LSA-R.S. 7:8:
"§ 8. When instrument payable to order
"The instrument is payable to order where it is drawn payable to the order of a specified person or to him or his order. It may be drawn payable to the order of:
"(1) * * *
"(2) * * *
"(3) the drawee; * * *."
However, counsel for defendants urges that the instant case falls under the definition and provision of LSA-R.S. 7:9, as follows:
"§ 9. When instrument payable to bearer
"The instrument is payable to bearer:
"(1) * * *
"(2) * * *
"(3) When it is payable to the order of a fictitious or non-existing or living person not intended to have any interest in it, and such fact was known to the person making it so payable, or known to his employee or other agent who supplies the name of such payee. * * *"
Paraphrasing the last above quoted statutory provision, it is clear that, thereunder, a negotiable instrument is payable to the bearer thereof when it is payable to the order of a person (under which category defendant bank must be considered) who is not intended to have any interest in it, which fact was known to the employee who supplied the name of such payee. This definition accurately fits and applies to the facts of the instant case, which we briefly summarize as follows:
1. The checks involved in this suit were payable to a living person, that is, the drawee bank, who was not intended to have any interest in the checks.
2. The fact that the payee was not intended to have any interest in the checks was known to C. W. Davis, who was Campbell's employee and who supplied the name of the drawee bank as the payee of the checks.
The above facts have been indisputably established in the instant case. There is not the slightest contention that the bank named as payee was intended to have any interest in the amounts represented by the checks and, indeed, it was testified by all parties as a matter of cold fact that the bank did not have any interest, nor did there exist any basis for an interest or a claim thereof.
The above stated resolution to the effect that these instruments were payable to bearer is not inconsistent with the statutory definition of instruments payable to order. LSA-R.S. 7:8 does not say that all instruments payable to the drawee thereof must be considered to be payable to order, but it only says that an instrument may be drawn payable to the order of the drawee. This qualification was clearly intended to permit the drawing of order instruments in favor of the drawee. But just as clearly the purpose of Section *579 9 changed the nature of an instrument payable to a drawee from an order to a bearer instrument when the conditions specified in such section were present. Illustrations of this difference may be so readily imagined, in such numerous circumstances, that we think an effort to make or point them would be in the nature of redundancy.
The provision to which we have referred as LSA-R.S. 7:9 is an amendment of the Negotiable Instruments Law which was effected by Act 312 of 1942. Prior to the amendment of Section 9 of Act 64 of 1904, which was the act establishing a Uniform Law with relation to Negotiable Instruments, the provisions and definition of an instrument payable to bearer, with which we are here specifically concerned, read as follows:
"When it is payable to the order of a fictitious or non-existing person, and such fact was known to the person making it so payable * * *."
As may be clearly perceived the definition was broadened in three respects; first, by adding the category of "living" persons; second, by adding the words "not intended to have any interest in it", and, third, by the addition of the words "or known to his employee or other agent who supplies the name of such payee."
If the events which gave rise to this suit had transpired prior to 1942 we think it is clear that plaintiff's contention would admit of no dispute, but we think it equally clear that the adoption of the amendment of 1942 which governs this action arising in 1946, has effectively deprived plaintiff of the foundation for its contention.
Learned counsel for plaintiff in support of their position have cited City National Bank of Baton Rouge v. Louisiana Savings Bank & Trust Co., 216 La. 262, 43 So.2d 602; and Couvillon v. Whitney National Bank of New Orleans, 218 La. 1096, 51 So.2d 798. Neither of the cited cases provides acceptable authority on the issue here tendered. The City National Bank case involved liability on an instrument which was dated some three years prior to the 1942 amendment to the Lousiana Negotiable Instruments Law, and, as a matter of fact, the interpretation of the corresponding section of the then existing statute was neither concerned nor considered by the court in the determination of the case. The Couvillon case involved a question of liability on forged checks, which proposition is not an issue in the instant case. The general pronouncements of the court in the Couvillon case, with all of which we agree, must be interpreted in the light of and with application to the issue there presented, and cannot serve as generally applicable to cases which involve different facts and easily distinguishable issues.
We have further considered with interest the numerous authorities from common law states which are cited in counsel's able, exhaustive and interesting brief, but we do not find any of them appropriate, either because they involve dissimilar facts, or because they are not concerned with the interpretation of laws which are analogous to the Louisiana Statute. For the same reason we accept and agree with the general rules as declared in 9 C.J.S., Banks and Banking, § 340, p. 682, and 7 American Jurisprudence, verbo "Banks", Section 506, page 360, to the effect that a bank is authorized to pay the proceeds of checks payable to the bank only to persons specified by the drawer, and that a bank is only authorized to charge a depositor with the payment of checks made in conformity with his orders or instruction. We simply point out that neither of these general rules can be engrafted into the jurisprudence of the state in instances where such action would do violence to the plain provisions and direction of a statute.
Since our resolution of the issue above considered serves to conclusively dispose of the matter before us, we deem it unnecessary to indulge in the superfluous discussion of the defense of estoppel and acquiescence.
For the reasons assigned the judgment appealed from is affirmed at appellant's cost.